## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| COTIVITI HOLDINGS, INC. and COTIVITI USA, LLC | Civil Action No. |
| Plaintiffs, | |
| v. | |
| JESSICA CLARK; CHRISTINA HOOD; MITCHELL PRATER; KELSEY SIMMONS; and BRITTANY TURNER | May 29, 2018 |
| Defendants. | |

## PLAINTIFFS' COMPLAINT

Plaintiffs Cotiviti Holdings, Inc. and its subsidiary Cotiviti USA, LLC (collectively "Plaintiffs" or "Cotiviti"), by and through their undersigned attorneys, Gordon Rees Scully Mansukhani, LLP ("Gordon & Rees") and for its Complaint against defendants Jessica Clark ("Defendant Clark"), Christina Hood ("Defendant Hood"), Mitchell Prater ("Defendant Prater"), Kelsey Simmons ("Defendant Simmons"), and Brittany Turner ("Defendant Turner") (collectively "Defendants"), allege as follows:

## NATURE OF THE ACTION

1.       This is a case involving the theft of Plaintiffs' business. Cotiviti, a leading provider of analytics-driven payment accuracy and spend management solutions focused primarily on the healthcare sector, recently learned that Defendants accepted employment with a direct competitor in violation of the Defendants' restrictive covenant agreements with Cotiviti.

2.      Cotiviti was formed in May 2014 through the merger of Connolly, a leader in retrospective payment accuracy solutions for the healthcare and retail sectors and iHealth Technologies, a leader in prospective payment accuracy solutions for the healthcare sector.

3.      As of December 31, 2017, Cotiviti has approximately 3,300 employees – 2,300 employees in the United States and 1,000 international employees.

4.      Cotiviti has operations throughout the United States, including operations in Connecticut, Pennsylvania, New York, and Kentucky. It also has operations in Canada and India.

5.      Each of the Defendants is a former employee of Connolly and Cotiviti. Each of the Defendants had a non-compete agreement contained within their employment contract. Each of the Defendants in this Action has left Cotiviti to work for a direct competitor of Cotiviti. Each of the Defendants has valuable proprietary information and trade secrets of Cotiviti.

6.      With this action, Plaintiffs seek preliminary injunctive relief, compensatory damages against Defendants arising from their contractual, statutory and/or common law violations, and other misconduct including but not limited to, breaches of the Defendants' agreements with Plaintiffs.

## PARTIES

7.      Plaintiff Cotiviti Holdings, Inc. is a Delaware corporation with its principal place of business located in Atlanta, Georgia.

8.      Plaintiff Cotiviti USA, LLC is a Delaware limited liability company. Cotiviti Holdings, Inc. is the sole member of Cotiviti USA, LLC. Accordingly, for diversity purposes, Cotiviti USA, LLC is considered a citizen of the states of Delaware and Georgia.

9.      Defendant Clark is an individual defendant domiciled in the State of Pennsylvania and is a resident of that state.

10.     Defendant Hood is an individual defendant domiciled in the State of Kentucky and is a resident of that state.

11.     Defendant Prater is an individual defendant domiciled in the State of Kentucky and is a resident of that state.

12.     Defendant Simmons is an individual defendant domiciled in the State of Kentucky and is a resident of that state.

13.     Defendant Turner, formerly Brittany Freitas, is an individual defendant domiciled in the State of Kentucky and is a resident of that state.

## JURISDICTION AND VENUE

14.     This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000.00) for each claim Plaintiffs have asserted against each Defendant. In addition, Plaintiffs are diverse from each Defendant as they are citizens of different states.

15.     Each of the Defendants possesses valuable proprietary information that belongs to Cotiviti. Their employment with a direct competitor threatens the business of Cotiviti. The damages each Defendant can and will cause Cotiviti by violating their non-compete agreements with Cotiviti far exceed the jurisdictional threshold of $75,000.00.

16.     Venue in this District is proper because the parties consented to this venue based upon forum selection clauses contained in the parties' Agreements.

17.     In addition to diversity, Plaintiffs allege violations of the Defend Trade Secrets Act. See 18 U.S.C. § 1836 *et seq.* As such, jurisdiction is appropriate over Plaintiffs' federal claim under 28 U.S.C. § 1331. In addition, jurisdiction is appropriate over Plaintiffs' related state law claims under 28 U.S.C. § 1367.

## GENERAL BACKGROUND FACTS

18.     Cotiviti is a leading provider of analytics-driven payment accuracy and spend management solutions, focused primarily on the healthcare sector.

19.     Cotiviti's integrated solutions help improve payment accuracy and deliver high-value health care to patients by joining payers and health care providers.

20.     As health care reimbursements are shifting toward quality of services, procedure outcomes, readmissions, and patient satisfaction, Cotiviti assists health care providers and payers, using its exclusive trade secrets, in measuring the quality and cost of service as well as the patient experience.

21.     Cotiviti leverages its robust technology platform, configurable analytics, proprietary information assets, and expertise in healthcare reimbursement to assist its clients enhance their claims payment accuracy and health care value-based reimbursements. In doing so, its exclusive trade secrets and algorithms assess, among other things, if a health care provider performed any unnecessary services that lead to low-value care, waste, and unneeded payments.

22.     As physician compensation shifts from fee-for-service towards value-based services and reimbursements, Cotiviti offers its unique services to health care systems, physician practice groups, and post-acute care centers, to develop curated networks, to compensate quality care and to recruit top doctors.

23.     Cotiviti works with over sixty (60) healthcare organizations, including a majority of the twenty-five (25) largest U.S. commercial, Medicare and Medicaid management health care plans, as well as CMS.

24.     Cotiviti is also a leading provider of payment accuracy solutions to approximately thirty (30) retail clients, including a majority of the ten (10) largest retailers in the United States.

25.     Equian, LLC ("Equian") is a direct competitor of Cotiviti in the field of analytics-driven payment accuracy and spend management solutions for the healthcare sector.

26.     Cotiviti's client information and trade secrets, including its audit processes and concepts, are not generally known to its competitors such as Equian. Cotiviti's audit processes and concepts are trade secrets which are only provided to trusted employees. These audit concepts are developed through the utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients to recover overpayments. Cotiviti has developed these audit processes and concepts over many years and reflects thousands of hours of work and the expenditure of substantial financial resources invested in generating and assisting its clients.

27.     The audit processes and concepts are internal processes that are not known to Cotiviti's clients or competitors. Cotiviti does not share audit processes and concepts with its clients and/or competitors.

28.     Specifically, Cotiviti has implemented controls to block employees from sending emails with attachments to well-known webmail accounts. It also blocks connecting removable media to workstations and copying data. Cotiviti further engages in web filtering to block well-known sites that allow for data exfiltration.

29.     These audit processes and concepts stem from unique integration, compilation, research, and cultivation. The audit processes and concepts allow Cotiviti to save their clients billions of dollars. They are the intellectual property of Cotiviti and foundation of everything Cotiviti does.

30.     If other companies such as Equian could lawfully obtain access to its audit processes and concepts, client data and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

31.     Equian has recently hired many of Cotiviti's elite-level employees, including the five (5) Defendants at issue in this Action and additional managers and senior auditors.

### COUNT ONE (Defendant Clark)
### (Breach of Contract)

32.     Plaintiffs incorporate the above allegations as if fully set forth herein.

33.     Defendant Clark is a former auditor of Cotiviti who regularly and continuously had access to Cotiviti's sensitive confidential information and trade secrets, including its audit concepts, clients, client information, service, and marketing information.

34.     Defendant Clark was a member of Cotiviti's Operational Growth Strategy ("OGS") Team. Employees tapped by Cotiviti to work on OGS are tasked with developing, collecting, centralizing, and deploying intellectual property and audit concepts throughout Cotiviti. They were given access to and/or expected to develop innovation concepts, and new capabilities through technology and process that would take Cotiviti's client offerings to the next level.

35.     On March 6, 2014, in consideration for employment with Cotiviti, Defendant Clark signed a "Non-Disclosure, Non-Solicitation and Non-Compete Agreement." A copy of this agreement is attached hereto as **Exhibit A** (hereinafter referred to as the "Clark Agreement.")

36.     As discussed in the Clark Agreement, as part of her employment, Defendant Clark was entrusted with "highly sensitive, confidential, restricted, and proprietary information involving Trade Secrets and Confidential Information." Exhibit A at p. 2.

37.     To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information, the Clark Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.

38.     Specifically, at page 4 of the Clark Agreement it provides:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the date of termination of such employment for whatever reason, you shall not directly or indirectly, within the Territory, provide substantially similar professional services to that part of any Person engaged in selling or providing any Competitive Services.

39.     In addition, at pages 3-4 of the Clark Agreement, it provides:

During the term of your employment with Connolly and for a period of two (2) years following the termination of such employment for whatever reason, you shall not (except on behalf of Connolly) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of Connolly; (ii) who is located within the Territory (as defined in the attached Exhibit A); (iii) with whom you had Meaningful Business Contact at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable); (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by Connolly as of the date of your solicitation or the termination of your employment, whichever is earlier ("Competitive Services"). "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust or other entity. "Meaningful Business Contact" means a direct, substantive conference, meeting, correspondence, discussion, or other contact or communication (but not merely a mass mailing, "cold call" telephone solicitation, incidental meeting at trade shows or conventions or other like incidental contacts), that is intended to result in, lead to, maintain, increase, facilitate, further or otherwise, aid the sale, license or other provision of products or services sold or provided by Connolly.

Upon termination of your employment with Connolly, you agree not to contact a Connolly Client regarding work performed by you on behalf of Connolly unless you have received prior written permission from Connolly to do so.

40.     Defendant Clark also agreed at page 7 of the Clark Agreement that:

You expressly agree and understand that the remedy at law for any breach by you of this agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon your violation of any provision of this agreement, Connolly shall be entitled to immediate injunctive relief and may obtain a temporary restraining order and permanent injunction restraining any further breach.

41.     Defendant Clark also agreed that, upon termination of employment with Cotiviti, she would not solicit employees of Cotiviti to work elsewhere.

42.     Specifically, at page 4 of the Clark Agreement, Defendant Clark agreed as follows:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the termination date of such employment, you will not, either directly or indirectly, (i) solicit any person who is at the time of the solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Connolly, (iii) with whom you had business contact in the course of your employment by Connolly, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Connolly.

43.     The parties also agreed and stipulated, at page 7 of the Clark Agreement, "to the exclusive jurisdiction of the federal or state courts within the State of Connecticut for any action which may be brought under or in connection with this agreement."

44.     Defendant Clark ignored and violated her obligations to Cotiviti as set forth in the Clark Agreement.

45.     Specifically, on March 9, 2018, she resigned her employment with Cotiviti and Defendant Clark now works for Equian.

46.     After learning of Defendant's intention to join Equian, Cotiviti advised Defendant Clark, by letter dated March 12, 2018, that she had violated the Agreement by taking a position with Equian. A copy of the March 12, 2018 letter is attached hereto as **Exhibit B.**

47.     Cotiviti requested written assurance by March 19, 2018 that Defendant Clark would not work for a competitor and that she had returned all documents or electronic data relating to Cotiviti.

48.     Defendant Clark did not respond to the March 12, 2018 letter and made no assurances.

49.     In addition to the breach of the Clark Agreement, it would be extremely difficult, if not impossible, for Defendant Clark to perform any duties for Equian without making use of the confidential, proprietary and trade secret information to which she was exposed during her employment at Cotiviti.

50.     The harm that Cotiviti would suffer if Defendant Clark were permitted to continue her employment at Equian and make use of Cotiviti's confidential, trade secret, and proprietary information would be irreparable. The value of that confidential, trade secret, proprietary information is not readily subject to financial valuation, cannot be easily duplicated, and will result in competitive disadvantage to Cotiviti in the hands of a competitor.

51.     In addition, upon information and belief, Defendant Clark and the other Defendants, have solicited and encouraged Cotiviti employees to leave Cotiviti for Equian,

52.     By virtue of the foregoing conduct, Defendant Clark has violated the Clark Agreement.

53.     Pursuant to the Clark Agreement, Defendant Clark agreed that she would not engage in a competing business as defined therein for a period of two years after separation of employment.

54.     Plaintiffs provided consideration for and fully performed their obligations under the Clark Agreement by, *inter alia*, employment of Defendant and providing her with access to Plaintiffs' confidential and trade secret information.

55.     The Clark Agreement is valid and enforceable under Connecticut law.

56.     The restrictive covenants contained in the Clark Agreement are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not limited to goodwill, clients, and confidential and proprietary business information. The Agreement is reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

57.     Defendant Clark breached her obligations under the Clark Agreement after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs.

58.     Upon information and belief, Defendant Clark's breaches of these covenants continue to this day, and will continue unless and until she is ordered to abide by the obligations to which she agreed when she accepted the Clark Agreement.

59.     As a direct result of Defendant Clark's breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendant Clark expressly acknowledged in the Clark Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

60.     In addition, as a consequence of Defendant Clark's breaches of the Clark Agreement, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

**COUNT TWO (Defendant Hood)**
**(Breach of Contract)**

61.     Plaintiffs incorporate the above allegations as if fully set forth herein.

62.     Defendant Hood is a former auditor of Cotiviti, who regularly and continuously had access to Cotiviti's sensitive confidential information and trade secrets, including its audit concepts, clients, client information, service, and marketing information.

63.     On August 25, 2014, in consideration for employment with Cotiviti, Defendant Hood signed a "Non-Disclosure, Non-Solicitation and Non-Compete Agreement." A copy of this agreement is attached hereto as **Exhibit C** (hereinafter referred to as the "Hood Agreement.")

64.     As discussed in the Hood Agreement, as part of her employment, Defendant Hood was entrusted with "highly sensitive, confidential, restricted, and proprietary information involving Trade Secrets and Confidential Information." Exhibit C at p. 2.

65.     To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information, the Hood Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.

66.     Specifically, at page 4 of the Hood Agreement it provides:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the date of termination of such employment for whatever reason, you shall not directly or indirectly, within the Territory, provide substantially similar professional services to that part of any Person engaged in selling or providing any Competitive Services.

67.     In addition, at pages 3-4 of the Hood Agreement, the agreement provides:

During the term of your employment with Connolly and for a period of two (2) years following the termination of such employment for whatever reason, you shall not (except on behalf of Connolly) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of Connolly; (ii) who is located within the Territory (as defined in the attached Exhibit A); (iii) with whom you had Meaningful Business Contact at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable); (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by Connolly as of the date of your solicitation or the termination of your employment, whichever is earlier ("Competitive Services"). "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust or other entity. "Meaningful Business Contact" means a direct, substantive conference, meeting, correspondence, discussion, or other contact or communication (but not merely a mass mailing, "cold call" telephone solicitation, incidental meeting at trade shows or conventions or other like incidental contacts), that is intended to result in, lead to, maintain, increase, facilitate, further or otherwise, aid the sale, license or other provision of products or services sold or provided by Connolly.

Upon termination of your employment with Connolly, you agree not to contact a Connolly Client regarding work performed by you on behalf of Connolly unless you have received prior written permission from Connolly to do so.

68.     Defendant Hood also agreed in page 7 of the Hood Agreement that:

You expressly agree and understand that the remedy at law for any breach by you of this agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon your violation of any provision of this agreement, Connolly shall be entitled to immediate injunctive relief and may obtain a temporary restraining order and permanent injunction restraining any further breach.

69.     Defendant Hood also agreed that, upon termination of employment with Cotiviti,

she would not solicit employees of Cotiviti to work elsewhere.

70.     Specifically, at page 4 of the Hood Agreement, Defendant Hood agreed as

follows:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the termination date of such employment, you will not, either directly or indirectly, (i) solicit any person who is at the time of the

solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Connolly, (iii) with whom you had business contact in the course of your employment by Connolly, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Connolly.

71.    The parties also agreed and stipulated, at page 7 of the Hood Agreement, "to the exclusive jurisdiction of the federal or state courts within the State of Connecticut for any action which may be brought under or in connection with this agreement."

72.    Defendant Hood ignored and violated her obligations to Cotiviti as set forth in the Hood Agreement.

73.    Specifically, on April 30, 2018, she resigned her employment and did not disclose that she would be working for Equian (in the same geographic location as she worked for Cotiviti).

74.    After learning of Defendant Hood's intention to join Equian, Cotiviti advised Defendant Hood by letter dated May 4, 2018, that she had violated the Agreement by taking a position with Equian. A copy of the May 4, 2018 letter is attached hereto as **Exhibit D.**

75.    Cotiviti requested written assurance that Defendant Hood would not work for a competitor and that she had returned all documents or electronic data relating to Cotiviti.

76.    Defendant Hood did not respond to the May 4, 2018 letter and made no assurances.

77.    In addition to the breach of the Hood Agreement, it would be extremely difficult, if not impossible, for Defendant Hood to perform any duties for Equian without making use of the confidential, proprietary and trade secret information to which she was exposed during her employment at Cotiviti.

78.     The harm that Cotiviti would suffer if Defendant Hood were permitted to continue her employment at Equian and make use of Cotiviti's confidential, trade secret, and proprietary information would be irreparable. The value of that confidential, trade secret, proprietary information is not readily subject to financial valuation, cannot be easily duplicated, and will result in competitive disadvantage to Cotiviti in the hands of a competitor.

79.     In addition, upon information and belief, Defendant Hood and the other Defendants, have solicited and encouraged Cotiviti employees to leave Cotiviti for Equian,

80.     By virtue of the foregoing conduct, Defendant Hood has violated the Hood Agreement.

81.     Pursuant to the Hood Agreement, Defendant Hood agreed that she would not engage in a competing business as defined therein for a period of two years after separation of employment.

82.     Plaintiffs provided consideration for and fully performed their obligations under the Hood Agreement by, *inter alia*, employment of Defendant Hood and providing her with access to Plaintiffs' confidential and trade secret information.

83.     The Hood Agreement is valid and enforceable under Connecticut law.

84.     The restrictive covenants contained in the Hood Agreement are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not limited to goodwill, clients, and confidential and proprietary business information. The Hood Agreement is reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

85.     Defendant Hood breached her obligations under the Hood Agreement after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs.

14

86.     Upon information and belief, Defendant Hood's breaches of these covenants continue to this day, and will continue unless and until she is ordered to abide by the obligations to which she agreed when she accepted the Hood Agreement.

87.     As a direct result of Defendant Hood's breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendant Hood expressly acknowledged in the Hood Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

88.     In addition, as a consequence of Defendant Hood's breaches of the Hood Agreement, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

## COUNT THREE (Defendant Prater)
### (Breach of Contract)

89.     Plaintiffs incorporate the above allegations as if fully set forth herein.

90.     Defendant Prater is a former payment accuracy specialist of Cotiviti, who regularly and continuously had access to Cotiviti's sensitive confidential information and trade secrets, including its audit concepts, clients, client information, service, and marketing information.

91.     On April 17, 2015, in consideration for employment with Cotiviti, Defendant Prater signed a "Non-Disclosure, Non-Solicitation and Non-Compete Agreement." A copy of this agreement is attached hereto as **Exhibit E** (hereinafter referred to as the "Prater Agreement.")

92.     As discussed in the Prater Agreement, as part of his employment, Defendant Prater was trusted with "highly sensitive, confidential, restricted, and proprietary information involving Trade Secrets and Confidential Information." Exhibit E at p. 2.

93.     To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information, the Prater Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.

94.     Specifically, at page 4 of the Prater Agreement it provides:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the date of termination of such employment for whatever reason, you shall not directly or indirectly, within the Territory, provide substantially similar professional services to that part of any Person engaged in selling or providing any Competitive Services.

95.     In addition, at pages 3-4 of the Prater Agreement, the agreement provides:

During the term of your employment with Connolly and for a period of two (2) years following the termination of such employment for whatever reason, you shall not (except on behalf of Connolly) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of Connolly; (ii) who is located within the Territory (as defined in the attached Exhibit A); (iii) with whom you had Meaningful Business Contact at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable); (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by Connolly as of the date of your solicitation or the termination of your employment, whichever is earlier ("Competitive Services"). "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust or other entity. "Meaningful Business Contact" means a direct, substantive conference, meeting, correspondence, discussion, or other contact or communication (but not merely a mass mailing, "cold call" telephone solicitation, incidental meeting at trade shows or conventions or other like incidental contacts), that is intended to result in, lead to, maintain, increase, facilitate, further or otherwise, aid the sale, license or other provision of products or services sold or provided by Connolly.

Upon termination of your employment with Connolly, you agree not to contact a Connolly Client regarding work performed by you on behalf of Connolly unless you have received prior written permission from Connolly to do so.

96.     Defendant Prater also agreed in page 7 of the Prater Agreement that:

You expressly agree and understand that the remedy at law for any breach by you of this agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon your violation of any provision of this agreement, Connolly shall be entitled to immediate injunctive relief and may obtain a temporary restraining order and permanent injunction restraining any further breach.

97.     Defendant Prater also agreed that, upon termination of employment with Cotiviti,

he would not solicit employees of Cotiviti to work elsewhere.

98.     Specifically, at page 4 of the Prater Agreement, Defendant Prater agreed as

follows:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the termination date of such employment, you will not, either directly or indirectly, (i) solicit any person who is at the time of the solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Connolly, (iii) with whom you had business contact in the course of your employment by Connolly, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Connolly.

99.     The parties also agreed and stipulated, at page 7 of the Prater Agreement, "to the

exclusive jurisdiction of the federal or state courts within the State of Connecticut for any action

which may be brought under or in connection with this agreement."

100.    Defendant Prater ignored and violated his obligations to Cotiviti as set forth in the

Prater Agreement.

17

101. Specifically, on March 13, 2018, he resigned his employment and did not disclose that he would be working for Equian (in the same geographic location as he worked for Cotiviti).

102. After learning of Defendant's intention to join Equian, Cotiviti advised Defendant Prater by letter dated March 16, 2018, that he had violated the Agreements by taking a position with Equian. A copy of the March 16, 2018 letter is attached hereto as **Exhibit F.**

103. Cotiviti requested written assurance by March 23, 2018 that Defendant Prater would not work for a competitor and that he had returned all documents or electronic data relating to Cotiviti.

104. Defendant Prater did not respond to the March 16, 2018 letter and made no assurances.

105. In addition to the breach of his Agreement, it would be extremely difficult, if not impossible, for Defendant Prater to perform any duties for Equian without making use of the confidential, proprietary and trade secret information to which he was exposed during his employment at Cotiviti.

106. The harm that Cotiviti would suffer if Defendant Prater were permitted to continue his employment at Equian and make use of Cotiviti's confidential, trade secret, and proprietary information would be irreparable. The value of that confidential, trade secret, proprietary information is not readily subject to financial valuation, cannot be easily duplicated, and will result in competitive disadvantage to Cotiviti in the hands of a competitor.

107. In addition, upon information and belief, Defendant Prater and the other Defendants, have solicited and encouraged Cotiviti employees to leave Cotiviti for Equian,

108. By virtue of the foregoing conduct, Defendant Prater has violated the Prater Agreement.

109.    Pursuant to the Prater Agreement, Defendant Prater agreed that he would not engage in a competing business as defined therein for a period of two years after separation of employment.

110.    Plaintiffs provided consideration for and fully performed their obligations under the Prater Agreement by, *inter alia*, employment of Defendant and providing him with access to Plaintiffs' confidential and trade secret information.

111.    The Prater Agreement is valid and enforceable under Connecticut law.

112.    The restrictive covenants contained in the Prater Agreement are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not limited to goodwill, clients, and confidential and proprietary business information. The Agreement is reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

113.    Defendant Prater breached his obligations under the Prater Agreement after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs.

114.    Upon information and belief, Defendant Prater's breaches of these covenants continue to this day, and will continue unless and until he is ordered to abide by the obligations to which he agreed when he accepted the Prater Agreement.

115.    As a direct result of Defendant Prater's breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendant Prater expressly acknowledged in the Prater Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

116.    In addition, as a consequence of Defendant Prater's breaches of the Prater Agreement, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

<u>**COUNT FOUR (Defendant Simmons)**</u>
<u>**(Breach of Contract)**</u>

117.    Plaintiffs incorporate the above allegations as if fully set forth herein.

118.    Defendant Simmons is a former payment accuracy specialist of Cotiviti, who regularly and continuously had access to Cotiviti's sensitive confidential information and trade secrets, including its audit concepts, clients, client information, service, and marketing information.

119.    Defendant Simmons was a member of Cotiviti's OGS Team. Employees tapped by Cotiviti to work on OGS are tasked with developing, collecting, centralizing, and deploying intellectual property and audit concepts throughout Cotiviti. They were given access to and/or expected to develop innovation and concepts that would take Cotiviti's client offerings to the next level.

120.    On February 21, 2014, in consideration for employment with Cotiviti, Defendant Simmons signed a "Non-Disclosure, Non-Solicitation and Non-Compete Agreement." A copy of this agreement is attached hereto as **Exhibit G** (hereinafter referred to as the "Simmons Agreement.")

121.    As discussed in the Simmons Agreement, as part of her employment, Defendant Simmons was trusted with "highly sensitive, confidential, restricted, and proprietary information involving Trade Secrets and Confidential Information." Exhibit G at p. 2.

122.    To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information, the Simmons Agreement

contains express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.

123.    Specifically, at page 4 of the Simmons Agreement it provides:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the date of termination of such employment for whatever reason, you shall not directly or indirectly, within the Territory, provide substantially similar professional services to that part of any Person engaged in selling or providing any Competitive Services.

124.    In addition, at pages 3-4 of the Simmons Agreement, the agreement provides:

During the term of your employment with Connolly and for a period of two (2) years following the termination of such employment for whatever reason, you shall not (except on behalf of Connolly) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of Connolly; (ii) who is located within the Territory (as defined in the attached Exhibit A); (iii) with whom you had Meaningful Business Contact at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable); (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by Connolly as of the date of your solicitation or the termination of your employment, whichever is earlier ("Competitive Services"). "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust or other entity. "Meaningful Business Contact" means a direct, substantive conference, meeting, correspondence, discussion, or other contact or communication (but not merely a mass mailing, "cold call" telephone solicitation, incidental meeting at trade shows or conventions or other like incidental contacts), that is intended to result in, lead to, maintain, increase, facilitate, further or otherwise aid, the sale, license or other provision of products or services sold or provided by Connolly.

Upon termination of your employment with Connolly, you agree not to contact a Connolly Client regarding work performed by you on behalf of Connolly unless you have received prior written permission from Connolly to do so.

125.    Defendant Simmons also agreed in page 7 of the Simmons Agreement that:

You expressly agree and understand that the remedy at law for any breach by you of this agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon your violation of any provision of this agreement, Connolly shall be entitled to immediate injunctive relief and may

obtain a temporary restraining order and permanent injunction restraining any further breach.

126.    Defendant Simmons also agreed that, upon termination of employment with Cotiviti, she would not solicit employees of Cotiviti to work elsewhere.

127.    Specifically, at page 4 of the Simmons Agreement, Defendant Simmons agreed as follows:

> You agree that during the term of your employment by Connolly and for a period of two (2) years following the termination date of such employment, you will not, either directly or indirectly, (i) solicit any person who is at the time of the solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Connolly, (iii) with whom you had business contact in the course of your employment by Connolly, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Connolly.

128.    The parties also agreed and stipulated, at page 7 of the Simmons Agreement, "to the exclusive jurisdiction of the federal or state courts within the State of Connecticut for any action which may be brought under or in connection with this agreement."

129.    Defendant Simmons ignored and violated her obligations to Cotiviti as set forth in the Simmons Agreement.

130.    Specifically, on March 12, 2018, she resigned her employment and did not disclose that she would be working for Equian (in the same geographic location as she worked for Cotiviti).

131.    After learning of Defendant's intention to join Equian, Cotiviti advised Defendant Simmons by letter dated March 13, 2018, that she had violated the Agreement by taking a position with Equian. A copy of the March 13, 2018 letter is attached hereto as **Exhibit H.**

132.     Cotiviti requested written assurance by March 20, 2018 that Defendant Simmons would not work for a competitor and that she had returned all documents or electronic data relating to Cotiviti.

133.     Defendant Simmons did not respond to the March 13, 2018 letter and made no assurances.

134.     In addition to the breach of the Simmons Agreement, it would be extremely difficult, if not impossible, for Defendant Simmons to perform any duties for Equian without making use of the confidential, proprietary and trade secret information to which she was exposed during her employment at Cotiviti.

135.     The harm that Cotiviti would suffer if Defendant Simmons were permitted to continue her employment at Equian and make use of Cotiviti's confidential, trade secret, and proprietary information would be irreparable. The value of that confidential, trade secret, proprietary information is not readily subject to financial valuation, cannot be easily duplicated, and will result in competitive disadvantage to Cotiviti in the hands of a competitor.

136.     In addition, upon information and belief, Defendant Simmons and the other Defendants, have solicited and encouraged Cotiviti employees to leave Cotiviti for Equian,

137.     By virtue of the foregoing conduct, Defendant Simmons has violated the Simmons Agreement.

138.     Pursuant to the Simmons Agreement, Defendant Simmons agreed that she would not engage in a competing business as defined therein for a period of two years after separation of employment.

139.    Plaintiffs provided consideration for and fully performed their obligations under the Simmons Agreement by, *inter alia*, employment of Defendant Simmons and providing her with access to Plaintiffs' confidential and trade secret information.

140.    The Simmons Agreement is valid and enforceable under Connecticut law.

141.    The restrictive covenants contained in the Simmons Agreement are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not limited to goodwill, clients, and confidential and proprietary business information. The Agreement is reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

142.    Defendant Simmons breached her obligations under the Simmons Agreement after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs.

143.    Upon information and belief, Defendant Simmons's breaches of these covenants continue to this day, and will continue unless and until she is ordered to abide by the obligations to which she agreed when she accepted the Simmons Agreement.

144.    As a direct result of Defendant Simmons's breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendant Simmons expressly acknowledged in the Simmons Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

145.    In addition, as a consequence of Defendant Simmons' breaches of the Simmons Agreement, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

### COUNT FIVE (Defendant Turner)
### (Breach of Contract)

146.    Plaintiffs incorporate the above allegations as if fully set forth herein.

147.    Defendant Turner, formerly Brittany Freitas, is a former payment accuracy specialist of Cotiviti, who regularly and continuously had access to Cotiviti's sensitive confidential information and trade secrets, including its audit concepts, clients, client information, service, and marketing information.

148.    On April 4, 2014, in consideration for employment with Cotiviti, Defendant Turner signed a "Non-Disclosure, Non-Solicitation and Non-Compete Agreement." A copy of this agreement is attached hereto as **Exhibit I** (hereinafter referred to as the "Turner Agreement.")

149.    As discussed in the Turner Agreement, as part of her employment, Defendant Turner was trusted with "highly sensitive, confidential, restricted, and proprietary information involving Trade Secrets and Confidential Information." Exhibit I at p. 2.

150.    To further protect Cotiviti's trade secrets, confidential and other proprietary information, and in consideration for access to such information, the Turner Agreement contains express non-compete and non-solicitation covenants governing the protection and treatment of Cotiviti's confidential information.

151.    Specifically, at page 4 of the Turner Agreement it provides:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the date of termination of such employment for whatever reason, you shall not directly or indirectly, within the Territory, provide substantially similar professional services to that part of any Person engaged in selling or providing any Competitive Services.

152.    In addition, at pages 3-4 of the Turner Agreement, the agreement provides:

During the term of your employment with Connolly and for a period of two (2) years following the termination of such employment for whatever reason, you shall not (except on behalf of Connolly) solicit, either directly or indirectly, any Person: (i) who is a client or who was a client or an actively sought prospective client of Connolly; (ii) who is located within the Territory (as defined in the attached Exhibit A); (iii) with whom you had Meaningful Business Contact at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable); (iv) for the purpose of selling or otherwise providing to such client or prospective client, any services or products that are substantially similar to or competitive with any of the services or products provided by Connolly as of the date of your solicitation or the termination of your employment, whichever is earlier ("Competitive Services"). "Person" means any individual, sole proprietorship, partnership, corporation, limited liability company, joint venture, joint stock company, trust or other entity. "Meaningful Business Contact" means a direct, substantive conference, meeting, correspondence, discussion, or other contact or communication (but not merely a mass mailing, "cold call" telephone solicitation, incidental meeting at trade shows or conventions or other like incidental contacts), that is intended to result in, lead to, maintain, increase, facilitate, further or otherwise, aid the sale, license or other provision of products or services sold or provided by Connolly.

Upon termination of your employment with Connolly, you agree not to contact a Connolly Client regarding work performed by you on behalf of Connolly unless you have received prior written permission from Connolly to do so.

153.    Defendant Turner also agreed in page 7 of the Turner Agreement that:

You expressly agree and understand that the remedy at law for any breach by you of this agreement will be inadequate and that the damages flowing from such breach are not readily susceptible to being measured in monetary terms. Accordingly, it is acknowledged that upon your violation of any provision of this agreement, Connolly shall be entitled to immediate injunctive relief and may obtain a temporary restraining order and permanent injunction restraining any further breach.

154.    Defendant Turner also agreed that, upon termination of employment with Cotiviti,

she would not solicit employees of Cotiviti to work elsewhere.

155.    Specifically, at page 4 of the Turner Agreement, Defendant Turner agreed as

follows:

You agree that during the term of your employment by Connolly and for a period of two (2) years following the termination date of such employment, you will not, either directly or indirectly, (i) solicit any person who is at the time of the

solicitation, or was, at any time during the two (2) year period ending on the date on which your employment by Connolly ends (or shorter period, if applicable), (ii) an employee, agent, or independent contractor of Connolly, (iii) with whom you had business contact in the course of your employment by Connolly, (iv) for the purpose of offering employment to such person within the Territory with an individual or entity which is engaged in providing or selling Competitive Services, (v) for the purpose of providing any services which are substantially similar to the services performed by such person for Connolly.

156.    The parties also agreed and stipulated, at page 7 of the Turner Agreement, "to the exclusive jurisdiction of the federal or state courts within the State of Connecticut for any action which may be brought under or in connection with this agreement."

157.    Defendant Turner ignored and violated her obligations to Cotiviti as set forth in the Turner Agreement.

158.    Specifically, on January 4, 2018, she resigned her employment with Cotiviti and Defendant Turner now works for Equian.

159.    After learning of Defendant's intention to join Equian, Cotiviti advised Defendant Turner by letter dated March 16, 2018, that she had violated the Agreements by taking a position with Equian. A copy of the March 16, 2018 letter is attached hereto as **Exhibit J.**

160.    Cotiviti requested written assurance by March 23, 2018 that Defendant Turner would not work for a competitor and that she had returned all documents or electronic data relating to Cotiviti.

161.    Defendant Turner did not respond to the March 16, 2018 letter and made no assurances.

162.    In addition to the breach of the Turner Agreement, it would be extremely difficult, if not impossible, for Defendant Turner to perform any duties for Equian without making use of the confidential, proprietary and trade secret information to which she was exposed during her employment at Cotiviti.

163.     The harm that Cotiviti would suffer if Defendant Turner were permitted to continue her employment at Equian and make use of Cotiviti's confidential, trade secret, and proprietary information would be irreparable. The value of that confidential, trade secret, proprietary information is not readily subject to financial valuation, cannot be easily duplicated, and will result in competitive disadvantage to Cotiviti in the hands of a competitor.

164.     In addition, upon information and belief, Defendant Turner and the other Defendants, have solicited and encouraged Cotiviti employees to leave Cotiviti for Equian,

165.     By virtue of the foregoing conduct, Defendant Turner has violated the Turner Agreement.

166.     Pursuant to the Turner Agreement, Defendant Turner agreed that she would not engage in a competing business as defined therein for a period of two years after separation of employment.

167.     Plaintiffs provided consideration for and fully performed their obligations under the Turner Agreement by, *inter alia*, employment of Defendant and providing her with access to Plaintiffs' confidential and trade secret information.

168.     The Turner Agreement is valid and enforceable under Connecticut law.

169.     The restrictive covenants contained in the Turner Agreement are necessary and tailored to protect Plaintiffs' legitimate business interests, including but not limited to goodwill, clients, and confidential and proprietary business information. The Agreement is reasonably limited to the United States, in light of the fact that Cotiviti is an international company with operations throughout the world.

170.     Defendant Turner breached her obligations under the Turner Agreement after resigning from Plaintiffs by engaging in a business in direct competition with Plaintiffs.

171.     Upon information and belief, Defendant Turner's breaches of these covenants continue to this day, and will continue unless and until she is ordered to abide by the obligations to which she agreed when she accepted the Turner Agreement.

172.     As a direct result of Defendant Turner's breaches, Cotiviti is suffering and will continue to suffer irreparable injury, including loss of business expectancies, employees, clients, confidential information, and damage to goodwill, for which a remedy at law is inadequate – as Defendant Turner expressly acknowledged in the Turner Agreement. Accordingly, Plaintiffs are entitled to injunctive and equitable relief.

173.     In addition, as a consequence of Defendant Turner's breaches of the Turner Agreement, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

### COUNT SIX (ALL DEFENDANTS)
### (Misappropriation of Trade Secrets – 18 U.S.C. § 182)

174.     Plaintiffs incorporate the above allegations as if fully set forth herein.

175.     By virtue of their employment with Cotiviti and their performance of responsibilities for Cotiviti, Cotiviti provided Defendants access to and Defendants possessed trade secrets and confidential information of Cotiviti, including *inter alia*, access to confidential client information relating to Cotiviti's pricing, proprietary procedures, audit concepts, training, and intellectual property, among other information. Cotiviti's trade secrets, including its audit processes and concepts, are not generally known to its competitors such as Equian. Cotiviti's audit concepts are developed through utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients not to issue overpayments. These processes and concepts have been developed by Cotiviti over many years and reflect thousands of hours of work and the expenditure of substantial financial resources

29

invested in generating and assisting its clients. If other companies such as Equian could lawfully obtain access to its audit concepts, client data and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

176.    These audit processes and concepts stem from unique integration, compilation, research, and cultivation. Defendants were involved in the development and execution of Cotiviti's audit concepts.

177.    Cotiviti developed and maintained such information at great time, cost and expense to Cotiviti; such information is maintained on password protected networks accessible only be certain Cotiviti employees with need to use such information on Cotiviti's behalf.

178.    In addition, clients entrust Cotiviti with their highly confidential information, to which Defendants had access to Cotiviti's highly confidential information.

179.    Cotiviti derives independent economic value from the trade secrets entrusted to Defendants; such information is not generally known or readily ascertainable by proper means by other individuals who can obtain economic value from its disclosure and use, and the information is the subject of significant efforts to maintain its secrecy.

180.    Such information is considered a trade secret under the Federal Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1832 *et seq*., because Cotiviti derives independent economic value from this information not generally known to the public, the information is not readily ascertainable by proper means by persons who could obtain economic value from its disclosure or use, and the information is the subject of reasonable efforts to maintain its secrecy. 18 U.S.C. § 1839.

181.    Defendants knew, or should have known, that the information, as described: (1) is confidential; (2) was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) was developed or acquired by Cotiviti at great expense and effort; (4) was maintained as confidential and is not generally available to the public and Cotiviti's competitors such as Equian; (5) would provide significant benefit to Equian; and (6) is critical to Cotiviti's ability to conduct its business successfully.

182.    Defendants will actually and inevitably misappropriate Cotiviti's trade secrets and confidential information without Cotiviti's consent. Defendants cannot help but utilize in their new capacities with a competitor the audit concepts, particular client needs, and Cotiviti employee information. Even if Defendants agreed not to disclose any of this information, such agreement would be ineffective because the trade secrets acquired by Defendants during their employment are the exact information needed to effectively perform for Equian.

183.    Moreover, each of the Defendants agreed that: "Upon the termination or expiration of Your employment with Connolly, or upon a written request from Connolly, You agree to return all Confidential Information and Connolly property in Your possession including, all originals, copies, translations, notes, or any other form of said material, without retaining any copy or duplicates thereof, and promptly to delete or destroy any and all written, printed, electronic or other material or information derived from the Confidential Information." Exhibits A, C, E, G, I at p.

184.    Defendants will be, or have been, unjustly enriched by the misappropriation of Cotiviti's trade secrets and confidential information, and, unless restrained, will continue to use, divulge, inevitably disclose, acquire and/or otherwise misappropriate Cotiviti's trade secrets and confidential information.

185.    Defendants' actual and/or threatened misappropriation has been willful and malicious.

186.    As a result of the actual misappropriation of Cotiviti's trade secrets and confidential information, Plaintiffs have lost business expectancies, trade secrets, and goodwill in amounts which are not readily susceptible to determination, unless Defendants are enjoined and restrained by order of the Court.

187.    In addition, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

### COUNT SEVEN (ALL DEFENDANTS)
### (Violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 et seq. ("CUTSA"))

188.    Plaintiffs incorporate the above allegations as if fully set forth herein.

189.    The actions of Defendants, as set forth herein, constitute a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 et seq. ("CUTSA") and the common law.

190.    By virtue of their employment with Cotiviti and their performance of responsibilities for Cotiviti, Cotiviti provided Defendants access to and Defendants possessed trade secrets and confidential information of Cotiviti, including *inter alia*, access to confidential client information relating to Cotiviti's pricing, proprietary procedures, audit processes and concepts, training, and intellectual property, among other information.

191.    "Each of the Defendants agreed in their employment contracts agreed as follows: You acknowledge the protections provided Connolly's Trade Secrets under applicable law, [including the protections afforded by the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. § 35-50 et seq. (the "Act")], and agree not to disclose or misappropriate any such Trade

Secrets for so long as such materials or information constitute trade secrets under the Act. For purposes hereof the term "Trade Secret" is defined in the Act." See Exhibits A, C, E, G, I at p. 3.

192.   Cotiviti's trade secrets, including its audit processes and concepts, are not generally known to its competitors such as Equian. Cotiviti's audit process and concepts are developed through utilization of research and development teams which scour provider contracts, policies, and regulations to develop opportunities for its clients not to issue overpayments. These processes and concepts have been developed by Cotiviti over many years and reflect thousands of hours of work and the expenditure of substantial financial resources invested in generating and assisting its clients. If other companies such as Equian could lawfully obtain access to its audit concepts, client data and information, they would pay millions of dollars for the right to do so and the damage to Cotiviti's business and operations would be irreparable.

193.   On information and belief, the Defendants have used and otherwise misappropriated and continue to misappropriate Plaintiffs' proprietary and trade secret materials and information, including Cotiviti's pricing, proprietary procedures, audit processes and concepts, training, and intellectual property, among other information.

194.   As explained *supra*, the information used by Defendants is of extreme importance and value to the Plaintiffs who have put in great effort, time, and cultivation of its proprietary processes and information.

195.   These processes and information are closely held and not known outside the Plaintiffs' business.

196.   These processes and information are not readily ascertainable by outsiders.

197.   These processes and information are only given to those parties absolutely necessary in order to preserve the secrecy of said information.

198.    The Defendants acquired these trade secrets by improper means or under circumstances giving rise to a duty to maintain their secrecy and used them to the detriment of the Plaintiffs.

199.    Plaintiffs have sustained damages and injury as a result of the Defendants' misappropriation of Plaintiffs' trade secrets and have damaged the integrity of Plaintiffs' confidential information and business integrity.

200.    The Defendants will inevitably use this information for their own benefit.

201.    Defendants' conduct constitutes a violation of CUTSA.

202.    Plaintiffs will also suffer irreparable damage and injury due to Defendants misappropriation of the trade secret information if the Defendants are not enjoined from the use of such information. Plaintiffs have no adequate remedy at law to compensate for the harms caused by the acts and conduct of Defendants.

203.    Defendants' conduct has caused and stands to cause Plaintiffs substantial and immediate irreparable injury, including the actual and potential loss of client relationships and goodwill, as well as confidential, proprietary, and trade secret information.

204.    As a result of the misappropriation of Cotiviti's trade secrets and confidential information, Plaintiffs have lost business expectancies, trade secrets, and goodwill in amounts which are not readily susceptible to determination, unless Defendants are enjoined and restrained by order of the Court.

205.    The Defendants misappropriation of Cotiviti's trade secrets and confidential information was and is willful and malicious and resulted in the Defendants being unjustly enriched.

206.    In addition, Plaintiffs seek actual, consequential, compensatory, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

### COUNT EIGHT (ALL DEFENDANTS)
### (Violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA"))

207.    Plaintiffs incorporate the above allegations as if fully set forth herein.

208.    The acts and conduct of Defendants alleged above is unethical, unscrupulous, unfair and deceptive, and constitutes an unfair method of competition or trade practice in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA").

209.    In particular, the Defendants willful disregard of their obligations under their employment agreements with Cotiviti, including, but not limited, the disregard of non-competition agreements, is unethical and unfair.

210.    In addition, Defendants' misappropriation of Cotiviti's proprietary information, and use of that information with a direct competitor is unethical and unfair.

211.    Cotiviti is a person within the meaning of Conn. Gen. Stat. §§ 42-110a(3) and 42-110g(a) entitled to bring an action under CUTPA.

212.    At all relevant times, Cotiviti was a person acting in the conduct of trade or commerce within the meaning of CUTPA, both within and outside of the State of Connecticut.

213.    The foregoing actions of Defendants are unethical, unscrupulous, and offensive to public policy, and constitute unfair and deceptive acts and practices in the conduct of trade or commerce, in violation of CUTPA.

214.    Defendants engaged in the unfair and/or deceptive acts and practices willfully and knowingly.

215.   As a result of the foregoing unfair and deceptive acts and practices, Cotiviti has suffered an ascertainable loss within the meaning of Conn. Gen. Stat. § 42-110g(a) and has suffered, and will continue to suffer, damages in an amount to be determined at trial.

216.   Defendants' violation of CUTPA was carried out of the purpose of competing unfairly with Plaintiffs.

217.   The actions of Defendants, as set forth herein, constitute a violation of the Connecticut Uniform Trade Secrets Act, Conn. Gen. Stat. §§ 35-50 et seq. ("CUTSA") and the common law.

218.   Plaintiffs seek actual, consequential, compensatory, treble, and punitive damages, along with reasonable attorneys' fees and costs, in an amount to be determined at trial.

219.   Pursuant to Conn. Gen. Stat. § 42-110g(c), Plaintiffs will give due notice of its claims to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection for the State of Connecticut.

## COUNT NINE (ALL DEFENDANTS)
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

220.   Plaintiffs incorporate the above allegations as if fully set forth herein.

221.   Pursuant to their employments agreements, Defendants owed Plaintiffs a duty of good faith and fair dealing in the performance of their obligations under the agreements.

222.   Plaintiffs reasonably expected to receive benefits pursuant to the employment agreement by virtue of Defendants' promises to abide by the terms of their respective employment agreements.

223.   Defendants breached their duty of good faith and fair dealing by acting in bad faith, including, but not limited to, the acts, omissions and statements of Defendants specifically

alleged above and incorporated herein, to injure Cotiviti's right to receive the benefits due to it pursuant to the Agreement.

224.    By virtue of the foregoing, Plaintiffs have suffered, and continues to suffer injuries and damages for which Defendants are liable.

## PRAYER FOR RELIEF

WHEREFORE, by virtue of the acts and conduct complained above, Cotiviti demands judgment in its favor and against Defendants for preliminary and permanent injunctive relief and damages in connection with the above and respectfully requests:

1.    A preliminary injunction enjoining Defendants, directly or indirectly, and whether alone or in concert with others, including any officer, agent, employee and/or representative of Equian, from:

    a.  breaching any of the terms of the employment agreements, including but not limited to the non-disclosure and non-competition covenant;

    b.  using, disclosing, or transmitting for any purpose, including the solicitation or conducting of business or initiation of any contact with Cotiviti's clients, the information contained in the records of Cotiviti, or other information pertaining to Cotiviti's clients, including, but not limited to, the names, addresses, email addresses, personal data, and financial information of the clients;

    c.  being employed by and/or working with Equian in any capacity; and

    d.  destroying, erasing, or otherwise making unavailable for further proceedings in this matter, any records or documents (including data or information maintained in computer files or other electronic storage media) in Defendants'

possession, custody, or control which were obtained from, or which contain information derived from, any Cotiviti records, which pertain to Cotiviti's clients, or which relate to any of the events alleged in the Complaint in this action.

2.     An order requiring Defendants, and anyone acting in concert or participation with them, including counsel, and any agent, employee, officer, or representative of Equian, to return to Cotiviti's counsel, any and all Cotiviti records or information, whether in original, computerized, handwritten, or any other form, and not retain any copies;

3.     Actual, compensatory, and consequential damages in an amount to be proven at trial;

4.     Attorneys' fees and costs pursuant to the common law and Conn. Gen. Stat. §§ 35-53(b) and 42-110g(d);

5.     All damages, including treble and punitive damages, pursuant to the common law and Conn. Gen. Stat. §§ 35-53 and 42-110g(a);

6.     Costs and expenses incurred herein, including reasonable attorneys' fees and interest; and

7.     Any other relief the Court deems appropriate and proper.

PLAINTIFFS,
COTIVITI HOLDINGS, INC. AND
COTIVITI USA, LLC


BY /s/ *Cullen Guilmartin*
    Cullen Guilmartin (ct27667)
    Joseph J. Blyskal (ct28055)
    Gordon & Rees LLP
    95 Glastonbury Blvd., Suite 206
    Glastonbury, CT 06033
    Phone: (860) 278-7448
    Fax: (860) 560-0185
    Email: cguilmartin@grsm.com
    Email: jblyskal@grsm.com

Dated: May 29, 2018